IN THE U.S. DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

YOLANDA JACKSON, In Her
Individual Capacity and as Administrator
of the Estate of Pippa Hall-Jackson,
Deceased,
            Plaintiff,

vs.

BRIAN OWENS, Individually and as
Commissioner, Georgia Department of
Corrections; TIMOTHY WARD,
Individually and as Assistant
Commissioner, Georgia Department of
Corrections; CLAY TATUM,
Individually and as Former Warden,
Hays State Prison; SHAY HATCHER,
Individually and as Former Deputy
Warden, Hays State Prison; BETTY
BAILEY-DEAN, Individually and as
Former Deputy Warden, Hays State
Prison; TIMOTHY CLARK,
Individually and as Former Captain,
Hays State Prison; JEFFERY
MITCHELL, individually and as
Corrections Officer at Hays State Prison;
KELLY WENTZ, Individually and as
Corrections Officer at Hays State Prison;
and TIMOTHY CLARK, individually
and as former Lieutenant at Hays State
Prison;

Civil Action

File No.:

Jury Trial Demanded

Page 1

Defendants.

_____

# I. INTRODUCTION

1.  Plaintiff Yolanda Jackson, individually and in her capacity as Administrator of the Estate of Pippa Lamont Hall-Jackson ("Pippa"), brings this civil rights action pursuant to 42 U.S.C. § 1983 arising from the death of her son, Pippa Lamont Hall-Jackson on Tuesday, February 5, 2013. Pippa was murdered when prison officials placed Pippa and his killer on a bus, permitting the killer – known to prison officials to be from a rival gang – and his fellow gang members to bring their shanks with them, and then allowing the killer to have unsupervised access to Pippa. Putting Pippa in this situation was the equivalent of Defendants filling a jar with bees and wasps and spiders and shaking it up to watch them kill each other. After Pippa was stabbed, he lay on the ground writhing in pain as prison officials simply walked around him. This murder was caused by Defendants' actions and inactions that violated Pippa's clearly established constitutional rights and that converted Hays Prison into a killing field, with three murders of

prisoners taking place in the eight weeks immediately prior to Pippa's murder. Acting under color of law, Defendants deprived Pippa of his rights under the Constitution and laws of the United States. In particular, knowing that: Pippa was in fear for his life; armed gang members were the primary threat to Pippa's safety; gangs controlled much of the prison in no small part due to the known failure of many locks; three inmates had already been murdered in the previous eight weeks; weapons were easily available and omnipresent at Hays; Pippa was on a gang with lethal enemies in the gang of Devann Anderson; Defendants placed Pippa on a bus with an armed rival gang members – Defendants having failed to conduct a meaningful weapons check of the inmates on the bus – who stabbed Pippa to death shortly after Pippa and the other inmate disembarked into an area where they were permitted to roam without any supervision.

# II. THE PARTIES

2.   Pippa Hall-Jackson was a prisoner in the Hays State Prison.

3.   Pippa was murdered while in transit from Hays State Prison to Jackson State Prison.

4.    Pippa had no spouse or children at the time of his murder.

5.    Plaintiff Yolanda Jackson is Pippa's sole parent.

6.    Plaintiff Yolanda Jackson was appointed by the DeKalb County Probate Court as the Administrator of the Pippa's estate.

7.    Brian Owens is and was at all relevant times the Commissioner of the Georgia Department of Corrections ("GDC").

8.    As Commissioner, Defendant Owens is responsible for the supervision of operations at GDC facilities.

9.    Defendant Owens is being sued in his individual capacity.

10.   Defendant Timothy Ward is and was at all relevant times the Assistant Commissioner of the GDC.

11.   As Assistant Commissioner, Defendant Ward shares responsibility for the supervision of operations at GDC facilities.

12.   Defendant Ward is being sued in his individual capacity.

13.   Defendant Clay Tatum was the warden at Hays State Prison at all times relevant to this action.

14.     Defendant Tatum had final responsibility for the day-to-day operations at Hays State Prison.

15.     Defendant Tatum is being sued in his individual capacity.

16.     Defendant Shay Hatcher was a Deputy Warden of Security at Hays State Prison at all times relevant to this action.

17.     Defendant Hatcher shared responsibility for the day-to-day operations at Hays State Prison.

18.     Defendant Hatcher is being sued in his individual capacity.

19.     Defendant Betty Bailey-Dean was a Deputy Warden of Care and Treatment at Hays State Prison at all times relevant to this action.

20.     Defendant Bailey-Dean shared responsibility for the day-to-day operations at Hays State Prison.

21.     Defendant Bailey-Dean is being sued in her individual capacity.

22.     Defendant Timothy Clark as a Captain at Hays State Prison at all times relevant to this action.

23.   Captain Clark[1] shared responsibility for the day-to-day operations at Hays

State Prison.

24.   Captain Clark is being sued in his individual capacity.

25.   Defendant Kelly Wentz was a correctional officer at Hays State Prison at all

times relevant to this action.

26.   Defendant Wentz was one of the officers responsible for transporting Pippa

and 43 other prisoners via bus from Hays State Prison to the Georgia

Diagnostic and Classification Prison in Jackson, Georgia, on February 5,

2013.

27.   Defendant Wentz is being sued in his individual capacity.

28.   Defendant Jeffrey Mitchell was a correctional officer at Hays State Prison at

all times relevant to this action.

29.   Defendant Mitchell was one of the officers responsible for transporting

Pippa and 43 other prisones via bus from Hays State Prison to the Georgia

Diagnostic and Classification Prison in Jackson, Georgia.

---

[1]Two defendants share the name "Timothy Clark." To distinguish between
the two of them, this Complaint refers to them by their rank while they served at
Hays, with the first defendant to as Captain Clark and the second defendant
referred to as Lieutenant Clark.

30.     Defendant Mitchell is being sued in his individual capacity.

31.     Defendant Timothy Clark ("Lieutenant Clark") served as a Corrections Officer with the rank of lieutenant at Hays State Prison at all times relevant to this action.

32.     Lieutenant Clark was the officer in charge during the late night and early morning that Pippa and approximately 43 other prisoners from Hays State Prison were removed from their cells and placed on a bus for transport to Georgia Diagnostic and Classification Prison in Jackson, Georgia.

33.     Lieutenant Clark is being sued in his individual capacity.

34.     The Defendants are citizens of the United States and the State of Georgia. At all times relevant herein, the Defendants acted under color of state law based on their positions within the Georgia Department of Corrections.

# III. JURISDICTION

35.     This action is brought pursuant to 42 U.S.C. § 1983, and this Court has jurisdiction pursuant to 28 U.S.C. § § 1331 and 1343 (a)(3) and (4).

# IV. VENUE

36.     Venue is proper in this District and in the Rome Division under 28 U.S.C. § 1391(b)(2) because a substantial part of the violation of Pippa's constitutional rights that led to Pippa's murder took place at Hays State Prison, which is located in Trion, Georgia.  Hays State Prison is situated within the district and divisional boundaries of the Northern District of Georgia, Rome Division.

# V. OPERATIVE FACTS

## A. The Pervasive Dangerous Conditions at Hays

37.     Hays State Prison ("Hays") is a maximum security prison in Georgia.

38.     As of February 5, 2013, about half of the approximately 1,600 inmates at Hays had a "close" security classification.

39.     The Department of Corrections labels inmates as "close security" if the inmates are escape risks, have assaultive histories, are "deemed dangerous," and/or have detainers for other serious crimes.

40.   According to the Department of Corrections own rules and guidelines, close security inmates "require constant supervision by a correctional officer."

41.   Transportation of close security inmates requires the highest level of security.

42.   Corrections Officers who are responsible for transporting inmates are supposed to take steps to insure that the prisoners do not have weapons or contraband before they board the transport vehicle.

43.   In the months immediately prior to February 5, 2013, fights occurred between prisoners on a regular basis resulting in injuries requiring medical attention and hospitalization.

44.   Defendants knew that fights occurred between prisoners on a regular basis resulting in injuries requiring medical attention and hospitalization in the months immediately prior to February 5, 2013.

45.   During the months immediately preceding February 5, 2013, many prisoners were heavily armed with shanks, knives, and other weapons.

46.   As of February 5, 2013, Defendants knew that many prisoners were heavily armed with shanks, knives, and other weapons, and that the prisoners had been so armed for months.

47.   During the months immediately preceding February 5, 2013, weapons were often not confiscated from prisoners as required by standard operating procedure.

48.   As of February 5, 2013, Defendants knew that for months weapons had often not been confiscated from prisoners as required by standard operating procedure.

49.   As of February 5, 2013, Defendants knew that there were multiple reports of stabbings and deaths in recent years.

50.   As of February 5, 2013, Defendants knew that the rate and severity of prisoner-on-prisoner violence was worsening since 2010.

51.   In the months immediately preceding February 5, 2013, Hays was understaffed, such that critical security posts were unmanned.

52.  Defendants knew that, in the months immediately preceding February 5, 2013, Hays was understaffed, such that critical security posts were unmanned.

53.  In the months immediately preceding February 5, 2013, the understaffing at Hays left prisoners with supervision and monitoring below applicable standards.

54.  Defendants knew that, in the months immediately preceding February 5, 2013, the understaffing at Hays left prisoners with supervision and monitoring below applicable standards.

55.  In the months immediately preceding February 5, 2013, inmate-on-inmate violence was facilitated by the lack of monitoring and supervision of close security inmates caused by understaffing.

56.  Defendants knew that, in the months immediately preceding February 5, 2013, inmate-on-inmate violence was facilitated by the lack of monitoring and supervision of close security inmates caused by understaffing

57.  In the months preceding February 5, 2013, prisoners routinely slept in cells to which they were not assigned.

58.   As of February 5, 2013, Defendants knew that prisoners routinely slept in cells to which they were not assigned and had done so for months.

59.   In the months immediately prior to February 5, 2013, numerous prisoners possessed contraband cell phones, which allowed prisoners to coordinate with other prisoners.

60.   As of February 5, 2013, Defendants knew that numerous prisoners possessed contraband cell phones, which allowed prisoners to coordinate with other prisoners.

61.   In the months immediately prior to February 5, 2013, gang leaders exercised control over housing assignments and were permitted to expel prisoners they no longer wanted in their dorms.

62.   As of February 5, 2013, Defendants knew that gang leaders exercised control over housing assignments.

63.   During the months leading up to February 5, 2013, Defendants had accepted gang leaders' decisions to expel prisoners that the gang leaders no longer wanted in their dorms.

64.     In the months immediately prior to February 5, 2013, prisoners were able to move undetected across the prison campus to areas in which they were not authorized to be.

65.     As of February 5, 2013, Defendants knew that prisoners were able to move undetected across the prison campus to areas in which they were not authorized to be.

66.     In the months immediately prior to February 5, 2013, corrections officers were stabbed or otherwise seriously injured on several occasions.

67.     Defendants knew that, in the months immediately prior to February 5, 2013, corrections officers were stabbed or otherwise seriously injured on several occasions.

68.     In the months immediately prior to February 5, 2013, officers often remained in control rooms because they were afraid to enter prison dorms.

69.     Defendants knew that, in the months immediately prior to February 5, 2013, officers often remained in control rooms because they were afraid to enter prison dorms.

70.  Defendants were deliberately indifferent in responding to the known security hazards at Hays, even as the level of violence escalated and numerous inmates and officers were victimized.

71.  Two of the Defendants exacerbated the breakdown in security by alerting inmates to upcoming security "shakedowns," with the goal of advancing their careers by achieving positive reviews on departmental audits.

72.  In the months immediately prior to and at the time of Pippa's murder, stabbings and deaths were frequently reported.

73.  At the time of Pippa's murder, Defendants knew that a significant portion of the inmate-on-inmate violence was driven by gang affiliation of the involved prisoners.

74.  At the time of Pippa's murder, Defendants maintained files for each prisoner.

75.  At the time of Pippa's murder, the files maintained by Defendants on each prisoner noted the prisoner's gang affiliation.

76.   At the time of Pippa's murder, Defendants knew that placing rival gang members in close, unsupervised proximity posed a significant risk of injury to the prisoners.

77.   Defendants knew that, in the months immediately prior to and at the time of Pippa's murder, stabbings and deaths were frequently reported.

78.   In the months immediately prior to and at the time of Pippa's murder, stabbings by inmates were treated as disciplinary issues, not crimes, and were addressed, if at all, by solitary confinement, not charges being brought.

79.   Defendants knew that, in the months immediately prior to and at the time of Pippa's murder, stabbings by inmates were treated as disciplinary issues, not crimes, and were addressed, if at all, by solitary confinement, not charges being brought.

   B.  History of Known Broken Cell Door Locks at Hays

80.   Although Hays housed some of Georgia's "most challenging" offenders during the months preceding February 5, 2013, many of the cell doors at the prison have not worked for years.

81.  As of February 5, 2013, Defendants knew that many prison cell doors has not worked for years.

82.  Broken cell door locks enable inmates to avoid being locked down and separated, and to move undetected across the prison campus to areas where they are not authorized to be.

83.  As of February 5, 2013, Defendants knew that broken cell door locks enable inmates to avoid being locked down and separated, and to move undetected across the prison campus to areas where they are not authorized to be.

84.  Prison audits from 2008, 2009, 2010, 2011, and 2012 reported that the facility's cell door locks could be easily opened, leaving prisoners to roam in and out of their cells at will.

85.  As of February 5, 2013, Defendants were aware that the prison audits from 2008, 2009, 2010, 2011 and 2012, showed broken cell door locks.

86.  Despite this well-documented security hazard, Defendants neither fixed the problem with functioning locks, nor took reasonable alternative steps to control dangerous inmate movements.

87.  The broken cell door locks at Hays put prisoners and officers in danger.

88.   Defendants knew that the broken cell door locks at Hays put prisoners and officers in danger.

89.   Broken and defeated cell door locks were listed as a "Major/Critical Finding" on engineering audits at Hays in 2008, 2009, 2010, 2011, and 2012.

90.   The problem of broken cell locks worsened during the years preceding February 5, 2013.

91.   On August 5, 2008, an Engineering Comprehensive Audit by the GDC's North Field Engineering department found that 65 locks were "defeated" and stated that "[t]he locks need to be repaired or replaced."

92.   On November 3, 2009, an Engineering Comprehensive Audit by the GDC's North Field Engineering office discovered a "[h]igh number of locks that can be defeated."

93.   The 2009 audit further noted that "[e]ngineering has Hays on the list for a complete lock replacement."

94.   Another Engineering Comprehensive Audit conducted by the GDC's North Field Engineering office between July 19, 2010, and July 21, 2010, listed "Locks and Locking Control Panel" under "Major/Critical Findings."

95.   On July 26, 2010, the GDC's Audits and Compliance Unit sent a letter to Warden Tatum making a finding that "Locks and Locking Control Panels can be easily opened."

96.   An Engineering Audit conducted by the GDC's North Field Engineering office between May 31, 2011, and June 2, 2011, listed "The Locks and Locking Control Panels" under "Major/Critical Findings."

97.   The 2011 Audit noted that Hays would be getting a new locking control system.

98.   Broken door locks were also well documented in incident reports, which were written by officers and reviewed by Defendants.

99.   On May 31, 2011, Officer D. Cable wrote in a Use of Force Supplemental Report that a prisoner who refused to remain in his cell attacked him: "Inmates were on lock down[.] Inmates came out of cell [and] refused to return back to cell after a direct order."

100.  A report summarizing an Engineering Comprehensive Audit that took place between September 26, 2011, and September 27, 2011, listed "DOOR LOOCKS" [sic] under "Major/Critical Findings."

101. The September 2011 audit further stated that 119 out of 365 – or nearly one-third – of door locks tested had "problems."

102. A "Breakdown of Lock Audit Problems Found at Hays SP" on September 27, 2011, indicated that deadlocks could be defeated for 21% of the 365 locks tested.

103. The Executive Summary of the Comprehensive Audit, written by the Audits and Compliance Unit, and sent to Warden Tatum on September 28, 2011, stated "Finding: Locks and Locking Controls – The locks in the inmate housing area could be easily defeated."

104. A report summarizing an Engineering Comprehensive Audit that took place between September 10, 2012, and September 12, 2012, stated "High Number of Cell Door Locks that will not Deadlock."

105. The 2012 report further found that of 442 locks checked, 184—*41% of the locks tested*—were able to be "defeated."

106. Warden Tatum prepared an "Executive Summary" on October 16, 2012, stating, "Findings: Locks and Locking Controls – High number of cell door locks were able to be defeated."

107.    Although Defendants and other GDC officials knew that this maximum security prison lacked functioning cell door locks, they were deliberately indifferent in failing to take reasonable steps to fix this problem (or to otherwise control inmate movement) even after prisoners had been killed as a direct result of security failures.

108.    On February 14, 2013, the GDC submitted a "Purchase Order" for the replacement of the locks at Hays.

109.    The purchase order acknowledged that broken locks had resulted in attacks on inmates and staff.

110.    The purchase order stated:

> Hays State Prison *has had recurring problems* with the Cell Door locks in its housing units.  This situation has *severe security implications* in that *breaches of the locks have resulted in attacks on inmates and staff.*  This is a situation which must be addressed and corrected as fast as possible and therefore GDC has chosen to contract directly with a company to

replace the existing locks with more secure locking system.

This is considered an Emergency Purchase situation.

111.    This purchase order was submitted over four years after audits clearly revealed a

serious problem with broken locks at Hays State Prison.

C.  History of Widespread Abuse and Violence at Hays and Defendants'
Deliberate Indifference to Those Conditions

112.    In the months immediately prior to Pippa's murder, Defendants knew that the

foregoing conditions posed a significant risk of harm to prisoners in violation of

clearly established law.

113.    Defendants were on notice of and subjectively aware of the foregoing critical

problems of safety, security, and violence at Hays State Prison and of the specific

risk that the prison conditions presented to Pippa as demonstrated by the

following:

(a)    Defendants Owens, Ward, Tatum, Hatcher, Bailey-Dean, and Captain

Clark reviewed incident reports in which a high rate of deaths, stabbings,

and assaults was documented.  These incident reports put the Defendants

on notice of the serious risk of harm to and life-threatening conditions for

inmates.

(b)    Defendants Owens, Ward, Tatum, Hatcher, Bailey-Dean, and Captain

Clark knew that GDC internal audits found a pervasive problem of broken

locks on cell doors, year after year, from approximately 2008 until 2012.

(c)    Defendants knew that Hays officers had been critically injured by prisoners

wielding weapons.

(d)    Defendants knew that the security failures described above had

contributed to the death of another prisoner on December 19, 2012.

(e)    Defendants knew that the security failures described above had

contributed to the death of another prisoner on or about December 26,

2012.

(f)    Defendants knew that the security failures described above had

contributed to the death of another prisoner on or about January 18, 2013.

(g)    Defendants knew that many prisoners and prisoners' family members had

complained about the unusually high level of violence at Hays State Prison

and the safety of inmates there.

(h)    Defendants Owens and Tatum received written notice of the dangerous

conditions at Hays.  On February 17, 2012, the Southern Center for

Human Rights (SCHR) wrote to Commissioner Owens and GDC Legal

Counsel Robert Jones regarding the rising number of homicides and

assaults at Hays and other GDC facilities.  SCHR received no response to

its letter.

114.   Despite this notice that conditions at the prison were intolerable and

unconstitutional, the Defendants permitted security conditions at Hays to further

deteriorate.

115.   Defendants failed to take reasonable steps to fix broken locks at Hays.

116.   Due to Defendants failure to take reasonable steps to fix broken locks at Hays, cell

door locks in prison dormitories remained broken for years, permitting close-

security inmates at this maximum-security prison to enter and exit their cells – at

virtually any time of day or night – as they pleased.

117.   Defendants failed to fix the locks and failed to take other reasonable steps to

control inmate movement.

118.   The Defendants knew that Hays was not adequately staffed and failed to take

reasonable steps to ensure adequate staffing.

119. At the time of Pippa's murder, approximately fifteen percent of officer positions at Hays were vacant.

120. The vacant positions meant that less than a full staff was on duty at the time of Pippa's murder.

121. Security posts were left unmanned, leaving inmates without supervision.

122. Defendants Tatum, Hatcher and Captain Clark continued to permit gangs to control dorm housing assignments.

123. Defendants Tatum, Hatcher, and Captain Clark knew that, as a matter of course, officers led newly-arrived prisoners to a dorm and told them to find an open bunk.

124. Defendants Tatum, Hatcher, and Captain Clark knew that gangs would determine where new arrivals slept and were permitted to expel prisoners that they did not want in their dorms.

125. Defendants Tatum, Hatcher and Captain Clark were deliberately indifferent to the prevalence of contraband known to permeate the facility, including knives, cell phones, and drugs.

126.   Defendants Tatum, Hatcher and Captain Clark failed to ensure that prisoners found with shanks were disciplined to deter inmates from possessing deadly weapons.

127.   Defendants Tatum, Hatcher and Captain Clark failed to ensure that officers conducted adequate contraband searches.

128.   Defendants Hatcher and Captain Clark deliberately interfered with efforts by GDC tactical squads to search the prison.

129.   Defendants Hatcher and Captain Clark warned inmates about upcoming shakedowns in order to achieve positive reviews on departmental security audits.

130.   Defendants Hatcher and Captain Clark ordered correctional staff to go dorm to dorm to alert inmates to hide or dispose of contraband before tactical security squads arrived to search the prison.

131.   On at least one occasion, in June 2011, Defendant Hatcher ordered a Unit Manager to tell inmates that they would get pizza and chicken if the squad did not find contraband.

132.    In so doing, Defendants Hatcher and Captain Clark violated Georgia law and GDC policy, undermined officers' authority, and contributed to the breakdown in security that led to the deaths of Pippa and three others.

133.    As a result of the foregoing conditions and the Defendants' deliberate indifference to them, an atmosphere of chaos and violence reigned at Hays. According to GDC Incident Reports:

(a)    On August 20, 2011, inmate Alford Morris was murdered with a shank;

(b)    On October 7, 2011, one prisoner was stabbed eight times in the head and back and was transported to the emergency room in serious condition; another prisoner was sent to the hospital with five stab wounds;

(c)    On February 28, 2012, two officers were stabbed by a prisoner with a "home made sharpened weapon."  Both were rushed to the hospital via ambulance "for severe injuries."

134.    Despite the rising tide of violence, the Defendants still failed to fix broken locks and failed to reasonably respond to unsafe conditions that permitted the violence to occur.

135.   Despite the history of violence and inattention to safety failures, on May 29, 2012, the GDC inexplicably named Hays State Prison as "Facility of the Year"—an honor bestowed partly in recognition of the low amount of contraband found after Defendants pre-warned inmates of tactical squad searches.

136.   In the six months preceding Pippa's death, at least 15 men required off-site emergency medical care for serious injuries.

137.   The following incidents were documented in GDC Incident Reports written by Hays officers:

(a)   On July 27, 2012, an inmate reported he had been "tied up" in a cell and beaten.  He was transported to an offsite hospital for "abrasions and 2 puncture wounds to face, back, left hand, left leg and foot and right foot possible broken nose."

(b)   On July 28, 2012, an inmate was transported to the hospital by ambulance after an officer noticed him "bleeding profusely," with "multiple lacerations and puncture wounds to head, cheeks, ear, chest, back both arms and hands."

(c)     On August 10, 2012, an officer observed an inmate " bleeding from

his face and head" with " abrasions contusions, lacerations and

punctures to head, eye, face, chest, back and both arms."

(d)     On August 18, 2012, an inmate was transported to the hospital after an assault

which caused " abrasions, contusions, lacerations and punctures to head,

nose, both ears, left leg and right arm."

(e)     On August 19, 2012, an officer observed two inmates running " with what

looked to be shanks" and saw a third inmate " stumble downstairs with blood on

his back." The injured inmate had " contusions and lacerations to [his] back"

and was transported to a hospital.

(f)     On August 31, 2012, an officer saw " several inmates fighting with weapons"

and an inmate " covered in blood with visible injuries." The inmate

was taken by ambulance to the hospital with " 17 lacerations/puncture wounds to

chest and back and both arms."

(g)     On September 1, 2012, an officer witnessed an inmate " approach [another

inmate] from behind and stab him in the back multiple times with a sharp pieces

[sic] of metal." The injured inmate was transported to the hospital for

" lacerations and puncture wounds to chest, sides, back and arms."

(h)   On September 4, 2012, an officer observed an inmate with

" multiple stab wounds to head, back and left arm." The prisoner

was sent by ambulance to the hospital.

(i)   On September 9, 2012, an inmate with " blood on his clothing" approached

an officer for help. He was transported to the hospital for " multiple

lacerations and punctures to his chest, neck, left foot and back."

(j)   On September 21, 2012, an inmate who " appeared to have been assaulted"

asked an officer to be moved to another dorm. He had a swollen face and

" contusions, lacerations to head, eyes, face and back."

(k)   On September 25, 2012, an officer observed an inmate " standing with blood

coming [out] of his mouth" with " contusions and lacerations to head, mouth

and lips."

(l)   On September 28, 2012, a prisoner being chased by other prisoners jumped

off the top tier of the prison dorm, " dropped to the bottom range," and

was stabbed by several prisoners. He was taken to an offsite hospital for " multiple

lacerations to head, face, buttock and both hands."

(m)     On September 28, 2012, an officer " noticed [an inmate] come from his room

[] covered in blood."  The inmate was sent to the hospital for " blunt

injuries to facial [sic], head, both ears, nose and lip area."

(n)     On October 3, 2012, an officer saw an inmate " bleeding"  with " visible

injuries"  including " 30 lacerations/puncture wound[s] to back and legs."

(o)     On October 7, 2012, a bleeding man " collapsed on the sidewalk"  after being

stabbed in the chest, shoulder, and head. Prison medical staff was

summoned, and the prisoner was taken by ambulance to the hospital.

Bloodied knives were recovered from the dorm.

(p)     On October 27, 2012, an inmate with a " swollen face"  and " abrasions,

contusions and lacerations to head, both eyes and both arms"  approached an

officer saying he had been assaulted.

(q)     On October 29, 2012, an officer saw an inmate " on the ground with blood

coming from his face."  The prisoner was transported to the hospital for

" contusions and lacerations to head, ear, nose and face."

(r)    On November 1, 2012, two inmates stabbed another inmate with a " 7 inch

sharp metal weapon," causing the injured inmate to sustain " lacerations to

forehead and back of head."

(s)    On November 5, 2012, two inmates reported being assaulted. One had blood

on his clothes and [was] bleeding from the lip," and the other was " bleeding from

the nose."

(t)    On November 20, 2012, a prisoner reported that he had been assaulted by

gang members. He was " bleeding from the nose and had a big knot on his

forehead."

(u)    On November 27, 2012, a prisoner who reported that he had been assaulted

by six prisoners had " several abrasions to [the prisoner's] face and knots on the

back of his head."

(v)    On December 7, 2012, a prisoner who had been in his new dorm " for 5

minutes" approached an officer who " noticed he had been beaten badly."

The prisoner had " contusions to head, eyes, mouth and nose."

(w)    On December 8, 2012, two prisoners approached an officer, one of whom

was " badly beaten." The man had " abrasions, lacerations and contusions to

head, nose, face, mouth, neck, back and both arms and legs" and was sent to the hospital.

(x)     On December 9, 2012, an officer witnessed a prisoner "attacking" another prisoner. The injured man was taken to the hospital due to a "laceration to left ear and top of head."

(y)     On December 10, 2012, an officer observed a prisoner coming down the stairway and "noticed his shirt was covered in blood on both shoulders." As the officer talked to the injured man, "blood started running thru [sic] his shirt on the right shoulder." He was treated for "lacerations to eyes, head, chest, top of both arms front and back."

(z)     On December 11, 2012, an inmate was hospitalized after suffering "multiple abrasions, contusions, lacerations and possible fracture to head, eyes, cheek, face, mouth and left foot."

(aa)    On December 19, 2012, Derrick Stubbs was found dead in his segregation cell. Upon information and belief, he had been assaulted in another part of the prison where locks did not work.

(bb)   On December 26, 2012, one week after Mr. Stubbs's death, inmates killed fellow prisoner, Damion MacClain.

(cc)   On January 3, 2013, an inmate assaulted another inmate with a sharpened piece of metal.

(dd)   On January 12, 2013, a prisoner chased another prisoner and stabbed him with " a sharpened piece of metal."

(ee)   On January 18, 2013, inmates stabbed fellow prisoner Nathaniel Reynolds to death.

(ff)   On January 24, 2013, a minimum security inmate who had been placed in one of the prison's most dangerous dorms was raped.

(gg)   On January 25, 2013, a Hays prisoner was stabbed 25 times.

138.   The foregoing history of widespread abuse put Defendants on notice of the need to correct dangerous conditions at Hays.  Even after the three murders during a four week span, however, the Defendants failed to take reasonable steps to fix the prison's broken locks, to control inmate movement, or to otherwise address the lawlessness.

139.   Defendant Owens knew about the longstanding and pervasive problem of violence, broken cell door locks, understaffing, and serious security lapses at Hays as described in this Complaint.

140.   Despite knowing of longstanding and pervasive problem of violence, broken cell door locks, understaffing, and serious security lapses at Hays, Defendant Owens deliberately ignored the known risk of serious harm to prisoners.

141.   At the time of Pippa's murder, Defendant Ward was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence, understaffing, and broken locks.

142.   Defendant Ward knew about the problem of broken locks on cell doors.

143.   Despite knowing of the problems posed by working locks on cell doors, Defendant Ward failed to take reasonable steps to fix the problem, and failed to control inmate movement by other means.

144.   Defendant Ward further knew that Hays prisoners were subject to serious risk of harm from violence as described in this Complaint, but he deliberately ignored the known risk of serious harm to prisoners.

145. At the time of Pippa's murder, Defendant Tatum was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken locks.

146. Defendant Tatum knew about the longstanding problem of broken locks on the cell doors.

147. Despite knowing about the longstanding problem of broken locks on cell doors, Defendant Tatum failed to take a reasonable steps to fix the problem and failed to control intimate movement by other means.

148. Defendant Tatum knew that Hays prisoners were subject to a serious risk of harm from violence as described in this Complaint.

149. Defendant Tatum deliberately ignored the known serious risk of harm to prisoners.

150. Defendant Tatum permitted gang members to control prisoner housing assignments

151. Defendant Tatum permitted prisoners to possess dangerous contraband.

152. Defendant Tatum undertook the aforementioned actions and inactions deliberately and knowing that they increased the risk of harm to Pippa.

153.   Defendant Tatum specifically knew of the risk of harm to Pippa.

154.   At the time of Pippa's murder, Defendant Hatcher was on notice of the life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken cell door locks.

155.   Defendant Hatcher knew about the longstanding problem of broken locks on the cell doors.

156.   Despite knowing about the longstanding problem of broken locks on cell doors, Defendant Hatcher failed to take a reasonable steps to fix the problem and failed to control intimate movement by other means.

157.   Defendant Hatcher knew that Hays prisoners were subject to a serious risk of harm from violence as described in this Complaint.

158.   Defendant Hatcher deliberately ignored the known serious risk of harm to prisoners.

159.   Defendant Hatcher permitted gang members to control prisoner housing assignments

160.   Defendant Hatcher permitted prisoners to possess dangerous contraband.

161.   Defendant Hatcher specifically knew of the risk of harm to Pippa.

162.   Defendant Hatcher ordered subordinates to warn inmates in advance of tactical squad searches.

163.   Defendant Hatcher permitted gang members to control dorm housing assignments.

164.   Defendant Hatcher allowed prisoners to possess dangerous contraband.

165.   Defendant Hatcher undertook the aforementioned actions and inactions deliberately and knowing that they increased the risk of harm to Pippa.

166.   At the time of Pippa's murder, Defendant Bailey-Dean was on notice of the life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken cell door locks, and she knew of violent threats against Pippa specifically.

167.   Defendant Bailey-Dean knew about the longstanding problem of broken locks on cell doors, but she failed to take reasonable steps to fix the problem and failed to control inmate movement by other means.

168.   Defendant Bailey-Dean further knew that Hays prisoners were subject to a serious risk of harm from violence as set forth in this Complaint, but she deliberately ignored the known risk of serious harm to prisoners.

169. At the time of Pippa's murder, Captain Clark was on notice of the dangerous, life threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken cell door locks.

170. At the time of Pippa's murder, Captain Clark knew about the longstanding problem of broken locks on cell doors and the attendant improper inmate movement.

171. At the time of Pippa's murder, Captain Clark he failed to take reasonable steps to fix the broken cell door locks and failed to control improper inmate movement by other means.

172. At the time of Pippa's murder, Captain Clark further knew that Hays prisoners were subject to a serious risk of harm from violence.

173. Captain Clark deliberately ignored the known risk of serious harm to prisoners caused by the conditions at Hays.

174. Captain Clark exacerbated and encouraged the level of violence at Hays by ordering subordinates to warn inmates in advance of tactical squad searches.

175.    Captain Clark exacerbated and encouraged the level of violence at Hays by permitting gang members to control dorm housing assignments and conduct orientation for incoming inmates.

176.    Captain Clark exacerbated and encouraged the level of violence at Hays by allowing inmates to possess dangerous contraband.

177.    At the time Defendant Wentz transported the prisoners on February 5, 2013, he knew that three prisoners had been murdered by other prisoners at Hays State Prison during the previous eight weeks.

178.    At the time Defendant Wentz transported the prisoners on February 5, 2013, he knew that prisoners routinely were armed with weapons, such as shanks.

179.    At the time Defendant Wentz transported the prisoners on February 5, 2013, he knew that members of rival gangs in the prison posed an extreme danger to the safety of one another.

180.    At the time Defendant Wentz transported the prisoners on February 5, 2013, he knew that the specific prisoners he was transporting were being removed from Hays State Prison because they had rendered dangerous the dorm they occupied at Hays.

181.   At the time Defendant Wentz transported the prisoners on February 5, 2013, he knew that members of rival gangs were on his bus.

182.   Defendant Wentz was required to insure that the prisoners he transported on February 5, 2013, did not possess weapons.

183.   Defendant Wentz failed to insure that the prisoners he transported did not possess weapons.

184.   Defendant Wentz allowed prisoner Devann Anderson and other prisoners onto the bus even though they possessed shanks.

185.   Defendant Wentz was required to closely supervise prisoners he transported until he turned them over to officials at Georgia Diagnostic and Classification Prison in Jackson, Georgia.

186.   Defendant Wentz failed to supervise closely prisoners he transported until he turned them over to officials at Georgia Diagnostic and Classification Prison in Jackson, Georgia.

187.   Defendant Wentz permitted the prisoners to wander unsupervised in a field, providing Devann Anderson the opportunity to stab and kill Pippa.

188.   Defendant Wentz's actions and inactions were deliberate and undertaken knowing that they increased the risk of harm to Pippa.

189.   At the time Defendant Mitchell transported the prisoners on February 5, 2013, he knew that three prisoners had been murdered by other prisoners at Hays State Prison during the previous eight weeks.

190.   At the time Defendant Mitchell transported the prisoners on February 5, 2013, he knew that prisoners routinely were armed with weapons, such as shanks.

191.   At the time Defendant Mitchell transported the prisoners on February 5, 2013, he knew that members of rival gangs in the prison posed an extreme danger to the safety of one another.

192.   At the time Defendant Mitchell transported the prisoners on February 5, 2013, he knew that the specific prisoners he was transporting were being removed from Hays State Prison because they had rendered dangerous the dorm they occupied at Hays.

193.   At the time Defendant Mitchell transported the prisoners on February 5, 2013, he knew that members of rival gangs were on his bus.

194.    Defendant Mitchell was required to insure that the prisoners he transported did not possess weapons.

195.    Defendant Mitchell to insure that the prisoners he transported did not possess weapons.

196.    Defendant Mitchell allowed prisoner Devann Anderson and other prisoners onto the bus even though they possessed shanks.

197.    Defendant Mitchell was required to closely supervise prisoners he transported until he turned them over to officials at Georgia Diagnostic and Classification Prison in Jackson, Georgia.

198.    Defendant Mitchell failed to supervise closely prisoners he transported until he turned them over to officials at Georgia Diagnostic and Classification Prison in Jackson, Georgia.

199.    Defendant Mitchell permitted the prisoners to wander unsupervised in a field, providing Devann Anderson the opportunity to stab and kill Pippa.

200.    Defendant Mitchell's actions and inactions were deliberate and undertaken knowing that they increased the risk of harm to Pippa.

201. As of February 5, 2013, Lieutenant Clark knew that three prisoners had been murdered by other prisoners at Hays State Prison during the previous eight weeks.

202. As of February 5, 2013, Lieutenant Clark knew that prisoners routinely were armed with weapons, such as shanks.

203. As of February 5, 2013, Lieutenant Clark knew that members of rival gangs in the prison posed an extreme danger to the safety of one another.

204. As of February 5, 2013, Lieutenant Clark knew that the specific prisoners he was processing for transport were being removed from Hays State Prison because they had rendered dangerous the dorm they occupied at Hays.

205. As of February 5, 2013, Lieutenant Clark knew that members of rival gangs were being placed together on the bus.

206. On February 5, 2013, Lieutenant Clark was responsible for inspecting all prisoner property and the prisoners themselves before the prisoners boarded the bus to insure that none of the prisoners had any weapons.

207. Lieutenant Clark failed to inspect prisoner Devann Anderson and at least two other prisoners to board the bus, allowing them to board the bus with shanks in their possession.

208. Lieutenant Clark's actions and inactions were deliberate and undertaken knowing that they increased the risk of harm to Pippa.

209. Defendants were further on notice that Devann Anderson, the prisoner charged with killing Pippa, had a history of assault, having previously stabbed another inmate.

210. Defendants were further on notice that Devann Anderson, the prisoner charged with killing Pippa, was one of the statewide leaders of his gang and that his gang and Pippa's gang were mortal enemies with a history of violence against one another.

211. Despite this knowledge, Defendants placed an armed prisoner, Devann Anderson, on a bus with Pippa and then permitted prisoner Anderson to have unsupervised contact with Pippa, at which point Anderson stabbed Pippa to death.

E.  Murder of Pippa Lamont Hall-Jackson

212.    During the late night of February 4, 2013, and the early morning of February 5,

        2013, approximately 40 to 50 inmates housed at Hays were assembled and placed

        onto a bus, along with their property.

213.    Defendants knew that the inmates so assembled included inmates whose security

        level was " close."

214.    Defendants knew that the inmates were being relocated to other prisons around

        the state because their presence at Hays had contributed to the dangerous

        conditions at the prison.

215.    The unconstitutionally unsafe conditions, with broken locks and freely roaming,

        armed inmates, that Defendants permitted to exist at Hays had enabled these

        prisoners to convert Hays into a battle zone between warring gangs.

216.    Defendants knew that, among the prisoners being transported, were Pippa and

        Devann Anderson.

217.    Defendants knew that Pippa and Devann Anderson were affiliated with rival

        gangs.

218.   Defendants knew that Devann Anderson was among the statewide leaders of his gang.

219.   Defendants knew that fighting during the months prior to February 5, 2013, between Pippa's gang and Devann Anderson's gang had resulted in injuries to Devann Anderson's gang members.

220.   Defendants knew that, when members of one gang are injured by members of another gang, the first gang always seeks retribution against the second gang.

221.   Prior to the trip, Defendants knew that, due to the fact that Pippa's gang had injured a member of Devann Anderson's gang, Anderson would use any available opportunity to assault Pippa in retribution.

222.   In identifying the inmates to be transferred, Defendants failed to take reasonable efforts to prevent members from rival, fighting gangs to be transported together.

223.   Lieutenant Clark was the officer in charge for the processing of the inmates and placing them on their bus.

224.   Part of the processing of the inmates included examining and searching the inmates to insure that they did not have any weapons.

225. Lieutenant Clark permitted Devann Anderson to take a shank with him onto the bus.

226. Lieutenant Clark permitted at least two other prisoners from Devann Anderson's gang to get on the bus with their shanks.

227. Defendants Wentz and Mitchell were in charge of transporting the prisoners from Hays to Georgia Diagnostic and Classification Prison in Jackson, Georgia.

228. While Defendants Wentz and Mitchell did not participate in the screening of inmates for weapons, as the officers charged with transporting the inmates, they were nonetheless required to insure that the inmates had no weapons.

229. Defendants Wentz and Mitchell permitted Devann Anderson to board the bus even though he had a shank on him.

230. Defendants Wentz and Mitchell permitted at least two other prisoners, both members of Devann Anderson's gang, to board the bus with their shanks.

231. Defendants Wentz and Mitchell were on further notice of the violent propensities of the inmates they were transporting due to the fact that the inmates beat and destroyed the glasses of one of the prisoners who was on the bus.

232.   The prisoner who was beaten had to be removed from the bus and transported separately.

233.   Despite being on notice of the prisoners' violent proclivities during the ride to Jackson, Defendants Wentz and Mitchell took no further steps to verify that the prisoners had no weapons with them.

234.   Upon arrival at the prison in Jackson, Defendants Wentz and Mitchell unlocked the shackles on the prisoners.

235.   While Defendants Wentz and Mitchell told the prisoners to stand next to the bus after the shackles were removed, neither Wentz nor Mitchell monitored the freed prisoners.

236.   After they were freed, Devann Anderson and his fellow gang members waited for Pippa and his fellow gang members to emerge from a bathroom in a field at some distance from the bus where Defendants Wentz and Mitchell remained.

237.   As Pippa walked away from the bathroom, Devann Anderson attacked and stabbed Pippa in the heart.

238.   Devann Anderson and his fellow gang members ran from the scene and threw their shanks into a fenced area next to the bus parking lot.

239.  Pippa stumbled away from the fight, eventually falling to the ground behind another bus parked approximately twenty to fifty yards from where he was stabbed.

240.  Prison officials responded to where Pippa fell.

241.  For several minutes, the prison officials just stood looking at Pippa as he writhed in pain on the ground.

242.  After several minutes, a prison official finally administered aid to Pippa, but it was even longer before an ambulance arrived to take him to the hospital where he died.

243.  At the time of Pippa's murder, Pippa and Devann Anderson were supposed to be under the supervision and control of Defendants Wentz and Mitchell.

244.  Prior to February 5, 2013, Defendants knew that: (a) placing a crowded busload of violent prisoners; (b) where the group includes members of violent rival gang members with a history of recent fighting and ongoing retribution; (c) using insufficient numbers of corrections officers to screen the prisoners for weapons before boarding the bus; and (d) with insufficient numbers of corrections officers

to supervise the prisoners as they are being transported and unshackled; is not a

reasonable way to address the unconstitutionally unsafe conditions at Hays.

245.   Defendants' actions and inactions proximately caused Pippa's murder, in

violation of the Eighth Amendment to the United States Constitution.

246.   Plaintiff seeks damages for the murder of her son due to the deliberate

indifference of the Defendants.

# VI. COUNT I
# Violation of Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983

247.   Plaintiffs incorporate herein and re-allege, as if fully set forth herein, all

factual allegations set forth above.

248.   Defendants' policies, practices, acts, and omissions placed Pippa Hall-

Jackson at unreasonable and foreseeable risk of serious injury and death.

249.   Defendants acted with deliberate indifference to the safety of Pippa and other prisoners and officers at Hays State Prison. As a consequence, Pippa was incarcerated under conditions posing a substantial risk of serious harm.

250.   Defendants' policies, practices, acts, and omissions constituted deliberate indifference to a serious risk of harm to Pippa and constitute clearly-established violations of the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

251.   As a proximate result of Defendants' illegal and unconstitutional acts and omissions, Pippa was left unprotected; was attacked; experienced grave physical, emotional, and psychological injury and pain; and died.

252.   Defendants' above-described actions were deliberate and in reckless disregard of Pippa's constitutional rights.

253.   Defendants' conduct warrants an award for the wrongful death of Pippa Hall-Jackson.

254.   Defendants' conduct warrants an award for the pre-death pain and suffering of Pippa Hall-Jackson.

255.   In the alternative to an award for wrongful death, Defendants' conduct warrants an award of punitive damages in an amount to be determined at trial.

256.   Punitive damages are necessary to deter future Eighth Amendment violations by these Defendants and at this institution.

# VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

(a)   Assume jurisdiction over this action;

(b)   Grant Plaintiff a trial by jury of her peers;

(c)   Declare that the acts and omissions described herein violated Plaintiff's rights under the Constitution and laws of the United States;

(d)   Enter judgement in favor of Plaintiff and against each Defendant for all damages allowed by law, including, but not limited to:

    i.   The full value of the life of Pippa Lamont Hall-Jackson;

    ii.   The pre-death pain and suffering endured by Pippa Lamont Hall-Jackson;

    iii.   Funeral and burial expenses;

    iv.   Nominal damages; and

v.      Punitive damages.

(e)    Award Plaintiff the costs of this lawsuit and reasonable attorneys' and expert

fees and expenses pursuant to 42 U.S.C. § 1988(b) & (c) and as otherwise

allowed by law; and

(f)    Order such additional relief as this Court may deem just and proper.

Respectfully submitted this 11th day of October, 2014.

/s/ A. Thomas Stubbs
A. Thomas Stubbs
Georgia Bar No. 689310
*Attorney for Plaintiff Yolanda Jackson*

Law Office of A. Thomas Stubbs, LLC
125 Clairemont Avenue, Suite 515
Decatur, Ga 30030
Ph. (404) 378-3633
Fax (404) 377-8304
Email: tom@stubbslaw.com

/s/ Catherine E. Bruce
Catherine E. Bruce
Georgia Bar No. 709795
*Attorney for Plaintiff Yolanda Jackson*

Law Office of Catherine E. Bruce, LLC
125 Clairemont Avenue, Suite 515
Decatur, Ga 30030
Ph. (404) 378-3633
Fax (404) 377-8304
Email: catherine@catherinebrucelaw.com